FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 2 6 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

United States District Court
For Central District of California

Petitioner

Tyler Davis Bingham

v

United States of America

} NO. CR 02-00938 DOC
} LAVC 13-0052 Doc
} Defendants Travelle to
} Governments opposition
to motion pursuant to
28 USC § 2255

Defendant Tyler Davis Bingham responds in

Travelle to Governments opposition to defendants

28 USC § 2255.

Date June 19, 2014

RECEIVED
BUT NOT FILED

JUN 2 6 2014

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

BY                          DEPUTY

Respectfully submitted
Tyler Davis Bingham
Tyler D. Bingham 03325-071
P.O. Box 8500 ADV-max
Florence, Co. 81226-8500

1

Let me begin this Traverse by Apologizing to the court for errors in construction of the document. As the court is aware Defendant is both uneducated and most ignorant of the law.

## Argument

1) The prosecutors oppositine to Defendants crting of ineffective assistance of counsel is completely wrong. Defendant will show merit of his issue goes beyond counsels failure to appeal misconduct ruling stemming from Governments housing of informant in Florence H-unit. Indeed Though the governments state ment of Defendants failure to appeal H-unit misconduct are direct supports defendants claim o'f ineffective assistance

of counsel, because Defendant at time urged chief counsel Michael White and second counsel william S. Harris to raise the misconduct on direct appeal. Counsel William S. Harris advised defendant the issue was not allowable at that time and was to be raised on § 2255. The Defendant being most ignorant of the law deferred to counsels judgement.

Further defendants lead counsel Michael White died in 2011 of Leukemia. Since his death it has came to defendants attention through private investigator Don Ingwerson that lead counsel Michael White had suffered that terrible disease prior to defendants trial but had been in a state of remission. This knowledge suggests perhaps he

lacked the physical stamina for such a long and arduous trial. Having said that defendant was not informed of Health issues at that time.

2)   Defendant can and will show by court trial records and testimony that counsel fell below standard required, witness testimony will make it obvious Defendant was not given all discovery available to prosecutors office nor did defendants counsel persue discovery that came to light during the trial despite defendants urgings to do so.

3)   Prior to trial it was Known there had been an D.A. Ricco investigation in 1989. In fact his honor at one point one hearing the prosecutors

4

come in the 1989 Ricco said 'I know her, she is now a state judge and no shrinking Violet' His honor urged both prosecutor and Defendants counsel to speak with her. To my knowledge no effort was made.

The 1989 Ricco chief investigators were the Los Angeles gangs unit. Their investigation spanned years yet defendant received no discovery from that investigative ~~unit~~ entity.

One of their informants was called as a foundation witness in defendants Ricco. His name is Clifford Smith. In the course of testimony he mentions speaking on the phone from a Protections unit in California state Prison to one informant

5

named Michael Thompson a purported high ranking

member of the A.B. being housed ine the Los Angeles

Hall of Justice by the Los Angeles Gangs unit; while

they were developing a Ricco indictment.

Again Defendant urged counsel to obtain

information related to that Ricco. Defendants

counsel failed to do so, nor did prosecutors volunteer

those discoverys as required even though Smiths

testimony made clear how investigators Gotti there

and now were doing business...

Attached Smith Testimony 3-15-06 vol #3 Pages 12-17

Smith explains how he called Michael Thompson from

Prison to the Hall of Justice

Again to be clear Michael Thompson ine a cell ine

6

the Los Angeles Hall of Justice was able to receive

incoming calls and did receive at least several

from mr. Smith from the Tehachapi unit housing

informants who were freely sharing informations

on current cases.

Now given these facts it would follow the Los

Angeles gangs unit being an intelligence unit would

have taped every conversation michael Thompson

had. not only that but would have volumes of

informations on the 1989 Ricco. As would have the

Tehachapi prison allowing such calls.

4) The prosecutor falsely argues the Admissions

statement was produced on a format unavailable

to inmates. That is only partly true, except for

the possibility of H-unit prisoners who had access

to a computer of which capability or Fonts

and materials produced was never determined;

because defenedants counsel made no effort to

obtain computer or its hard drive for examination,

nor did prosecutor volunteer to provide it, despite

much testimony regarding a filing cabinet of

material produced on the

    June 7, 2006   S.I.S. agent Stoff of Florence may

who supervised the unit testifys inmate Roach

and other inmates had access to a computer and

produced A cabinet full of material which all inmates

had access to. He also mentions F/m 8-1 as

possibly being the site of prisoner computer specialist.

A fact ignored when urged to obtain computers hard drive.

Attached are transcripts of S.I.S. Stubbs testimony 6-7-06 Vol #2 Pages 10 thru-17 and pages 38 thru 41

5) Defendant urged counsel to call former prosecutor Turner and among those reasons are to demonstrate how he did business. I refer to testimony of Buzz miller 3-22-06 Vol #1 Page 49 Thru 64 attached

Miller testifys Prosecutor Turner in a prior murder case Refused to call him as a witness when he(miller) refused to omit parts of his testimony that would incriminate

9

another of Jessners witnesses's in the case.

Miller 3-22-06 vol#2 Page 60 attached
Testifys to having grand jury transcripts and
defendants indictment in wit sec unit and
making it available to other informants.

It will come to light Prosecutor Jessner had
agent Hakenlaii mail material to miller.

agent Hakenlaii transcripts 6-6-06. He
testifys to providing informers with money
including clifford smith even though an admitted
perjurer was given money and scheduled to
testify in the Griffin-Stinson case Oct 2006.

agent Hakenlaii admits sending Grand jury testimony
and Indictment to miller while admitting

10

indictment a road map to case. Agent Holenlani
dismisses it by saying indictment was available on
internet (However he does not say prisoners have
no access to internet)

attached Holenlani testimony 6-6-06 vol #1
pages 38 thru 57

Again Agent Holenlani testimony verifys had
Jessner did business making it apparent Jessner
should have been called to testify.

Agent of S.I.S. Stubb testify 3-23-06
vol #2 P 82 attached

memos were exchanged daily between Marion
Illinois and Florence ADX. memos would be
sent to Sacramento Intellegence (Stan Beckwith)

11

Dan Beckwith) of SAC. Intel which is A

clearing house for intelligence.

Dan Beckwith should have been called to

testify. During that period he was head of SAC.

Intel, and participated in debrief of Roach

and many others.

He was made associate warden at terminal

Island while defendants were being housed there.

He in fact showed up in court so often his

honor made him laizon between court and BOP.

Defendants asked counsel to object to that

relationship because of Beckwith's both professional

and personal gains at defendants loss and his

relationship with both informers and prosecutors.

12

Defendants counsel neither objected nor called him to testify.

Testimony Sidney Griffin 4-20-06 vol #2 P. 51 attached

Griffin admits asking Prosecutor Flynn for money. She told him she would relay request to agent Holinbarri.

4-20-06 vol #3 Griffin P. 45

Testify he was in a unit with Ranch and other informants and Ranch dictated who would testify. "Dictating to Tessmer."

attached 4-20-06 vol 3 Pages 24, 25, and 45. Goes directly to how Tessmer did business.

Former prosecutor Gregory Tessmer was architect of Defendant Ricco indictment, handling details right up to the eve of trial. That he resigned one eve of trial does not cleanse the unsavory methods he used to construct indictment. As they say no one is above the law. And Defendant urged counsel to call Gregory Tessmer to testify. They did not.

6-19-14

Respectfully Submitted
Tyler D. Bingham
Tyler D. Bingham

14

Tyler D. Bingham 03305-091
P.O. Box 8500 ADX MAX
Florence, Co. 81226-8500

## Certificate of Service

I Tyler Davis Bingham hereby swear under penalty of perjury that I placed in the U.S. mail a true and correct copy of;

motions in Traverse of response to Government opposition to Defendants 98 USC § 2255.(9)

To AUSA Stephen Wolfee (116400)
1500 US Court House
312 North Spring Street
Los Angeles, Ca. 90012

On this date June 19 2014

Signed Tyler Davis Bingham
Tyler Davis Bingham

Transcript attachments list

Clifford Smith   3-15-06   Vol 3   Pages 12-17

Shoff Prison SIS   6-7-06   Vol #2   Page 10-17

Shoff Prison SIS   6-7-06   Page 41

Buzz miller   3-22-06   Vol #1 Pages 49 thru 64

Buzz miller   3-22-06   Vol #2   Page 59-60

Aquato Halualani   6-6-06   Vol #1   pages 38 Thru 57

Shoff Prison SIS   3-23-06   Vol #2   P. 82

Sidney Griffin   4-20-06   Vol #2   Page 36

Sidney Griffin   4-20-06   Vol #3   Page 24 25 and 45

iii

Page 10

1    THE COURT: You may play Exhibit 1000.
2    MR. WHITE: And your Honor, I have transcripts.
3    THE COURT: Give those to Lisa and she'll hand
4 them to the jury.
5    Thank you.
6    MR. WHITE: Shall we mark one of those? Does that
7 get marked?
8    THE COURT: We'll take care of that, counsel, I
9 promise you. Thank you.
10    Now, if you'd be kind enough, while we're handing
11 this out, I'd like you to start playing this tape now.
12    Counsel, if you'll place the start button.
13    MR. WHITE: Yes.
14    THE COURT: Do that now. Thank you.
15    (The audiotape was played.)
16    THE COURT: All right. Ladies and gentlemen,
17 during that transcription, I want to advise you that the
18 tape recording you listened to is the best evidence. The
19 transcript you have in your possession will temporarily be
20 with you throughout the cross-examination, the redirect and
21 direct, but then it will be collected again.
22    And even if you hear some discrepancy between the
23 voice and the transcript that you're reading, it's the voice
24 that prevails. That's the best evidence. So the transcript
25 is only to help you.

Page 11

1    All right, counsel, if you'd like to continue your
2 cross.
3    MR. WHITE: Thank you, your Honor.
4    CROSS-EXAMINATION
5 BY MR. WHITE (CONTINUED)
6 Q. Mr. Smith, during the recess, did you have any
7 conversation with anybody about this tape?
8 A. No, sir.
9 Q. Were you thinking about it during the recess?
10 A. Thinking about this case?
11 Q. The tape. The tape that you just heard?
12 A. Yeah, I thought about it.
13 Q. Is it your -- still your recollection that when you
14 told Mr. Elliott that you lied in two multiple murder cases
15 in Oregon and you told him that you lied, is it still your
16 recollection that you were lying to Mr. Elliott?
17 A. No. I told -- I told Elliott the truth. This right
18 here is the truth.
19 Q. So what we just heard is the truth?
20 A. Yes. I lied in both those cases.
21 Q. You lied in both those cases and you lied this morning
22 when you said that you had lied to Mr. Elliott about lying
23 in both those cases, correct?
24 A. Yeah. Yes. Yeah. Yes, sir.
25 Q. You said that during the recess you were thinking about

Page 12

1 this tape, correct?
2 A. Yeah, I thought about it.
3 Q. You were trying to figure out a way to explain what you
4 had told Mr. Elliott to explain it to the jury as a lie to
5 Mr. Elliott; is that right?
6 A. No, sir.
7 Q. You were trying to figure out a way out; is that
8 correct?
9 A. Well, no. I already decided there wasn't no way out.
10 You caught me. I mean, what can I do?
11 Q. I want to ask you about a few of these things.
12    First of all, you mentioned Michael Thompson in
13 this tape; is that correct?
14 A. Yes, sir.
15 Q. You had mentioned Michael Thompson in your direct
16 testimony, correct?
17 A. Uh-huh.
18 Q. Is that a "yes"?
19 A. Yes, sir.
20 Q. You and he go way back?
21 A. Yes, sir.
22 Q. And Mr. Thompson was housed at the Los Angeles County
23 Jail in the Hall of Justice in a special cell; is that
24 right?
25 A. Yes, sir.

Page 13

1 Q. And that special cell you said had a telephone?
2 A. Yeah. One-way telephone.
3 Q. And you said it had other stuff in there, too?
4 A. Yeah. Yeah.
5 Q. Mr. Thompson was kind of a celebrity in the Los Angeles
6 County Jail at that point; is that correct?
7 A. I don't know. I don't know about his celebrity status.
8 They took care of him.
9 Q. They took care of him. Girlfriend got to visit him?
10 A. I don't know.
11 Q. You tell us that the first time you heard about the
12 Oregon case was from a man named Larry House; is that right?
13 A. Yes, sir.
14 Q. And that was at Tehachapi; is that correct?
15 A. Yes, sir.
16 Q. Before you ran into Mr. House and he talked about the
17 Oregon case, you knew absolutely nothing about it; is that
18 correct?
19 A. Yeah.
20 Q. You knew nothing about Bug-Eyed Bob McClure; is that
21 correct?
22 A. That's right.
23 Q. You knew nothing about Odis Garrett; is that correct?
24 A. That's right.
25 Q. And Mr. House, you -- you met Mr. House at Tehachapi in

Page 14

1  a special unit?
2  A. Yes. RHU.
3  Q. And what is that unit?
4  A. Restricted Housing Unit.
5  Q. Is that a unit that is full of informants?
6  A. Yeah. At the time it was. It no longer exists.
7  Q. And you and Mr. House were able to speak freely in that
8  unit?
9  A. Oh, yeah.
10  Q. All the inmates in that unit could speak freely; is
11  that correct?
12  A. Sure.
13  Q. So you had 12 informants walking around, they could
14  compare notes, they could talk about anything under the sun,
15  correct?
16  A. Well, there's only about six of us there.
17  Q. Okay. Six --
18  A. Yeah.
19  Q. -- at that point there were six inmates, correct?
20  A. Yeah, about that.
21  Q. So that, for example -- and you did it in this case --
22  you could talk to Larry House about a case you knew nothing
23  about, correct?
24  A. Yes, sir.
25  Q. After talking to House about the Oregon case -- and by

Page 15

1  the way, did House mention that Michael Thompson was
2  involved in the Oregon case, or did you ask House if Michael
3  Thompson was involved in the Oregon case?
4  A. I believe House mentioned it.
5  Q. And when House mentioned to you that Thompson was
6  involved in the Oregon case, did that cause you to think,
7  "Hmm, maybe I can get involved in the Oregon case?"
8  A. No, not originally. That wasn't my first thought.
9  Q. That was or was not?
10  A. That wasn't my first thought.
11  Q. At what point did you have that thought, that you could
12  get involved in the Oregon case, a case that you knew
13  absolutely nothing about?
14  A. Was sometime later during a conversation I was having
15  with Mike Thompson. He asked me would I do him a -- do
16  something for him.
17  Q. At some point you called Michael Thompson after finding
18  out that he also had a piece of this Oregon case?
19  A. Yeah. We called -- I called him several times.
20  Q. You spoke to Michael Thompson. He was in his cell at
21  the LA County Jail?
22  A. Yes, sir.
23  Q. And tell us what that discussion was about. How did
24  that go?
25  A. I'm really not -- word for word I can't really tell

Page 16

1  you. We -- probably like this. "I understand you're going
2  to go up in that Oregon case.
3  "Yeah.
4  "Larry told me you were going to go up in that
5  Oregon case.
6  "Yeah. Since you brought it up, let me run
7  something by you.
8  "Yeah.
9  "I need some help. Could you do this?"
10  Something along those lines. Now that's not word
11  for word.
12  Q. Okay.
13  A. If you got it different, I'll go with yours. But that
14  was basically it.
15  Q. When you're referring to whether I have it different,
16  you're talking about the tape that you just heard?
17  A. Yeah. Yeah. I mean --
18  Q. That tape you just heard was made eight years ago,
19  nine -- seven, eight years ago?
20  A. 1998, yeah.
21  Q. Okay. So your memory might have been a little bit
22  better back in 1998 of what the conversation you had with
23  Michael Thompson about this Oregon case?
24  A. Yeah, probably is. I really don't remember the exact
25  wording of the conversation that led up to me involving

Page 17

1  myself in that. I really don't.
2  Q. Okay. But the gist of it was that Michael Thompson
3  asked you if you could do him a favor; is that correct?
4  A. Yeah.
5  Q. And when you were talking to Thompson, you understood
6  that Thompson himself was preparing to lie in this Oregon
7  case, correct?
8  A. Yeah. I mean, soon as Larry told me about the Oregon
9  thing, I kind of knew something was up.
10  Q. That something that was up was that Michael Thompson
11  was prepared to testify in two multiple murder cases about
12  something he had no information, correct?
13  A. Yeah. Pretty much sums it up.
14  Q. And when you spoke to Michael Thompson, he needed you
15  to help him out, correct?
16  A. Yeah.
17  Q. And Michael Thompson explained to you what he needed;
18  is that right?
19  A. Yeah.
20  Q. He explained to you, in essence, the testimony that you
21  needed to deliver for him in these murder cases?
22  A. Well, I don't really remember me and him going over
23  word-for-word, line-for-line transcript of it. I really
24  don't, sir. It was something to, "I need you to do
25  something for me.

CR 02-938(E)-DOC          June 7, 2006

Page 10

1   on the next page.
2        THE COURT:  All right.  Thank you.
3   BY MR. FLEMING:
4   Q   I'm going to read the following questions and answers.
5   The questions were directed to you by Michael White, and the
6   answers that I read are your answers, okay?
7   A   Okay.
8   Q   Okay.  Starting at page 101.
9        By Mr. White:  "Were there computers in H Unit?"
10       Your answer:  "Yes, sir."
11       Question:  "How many?"
12       Answer:  "Two."
13       Question:  "Was one a laptop?"
14       Answer:  "Yes, sir."
15       "Where was that laptop kept?"
16       Answer:  "In H Unit down -- down range, there was like
17  a little research room within H Unit that it was kept."
18       Question:  "And the inmates in H had access to
19  that computer; is that correct?"
20       Your answer:  "Yes, sir."
21       Question:  "And Kevin Roach often used that laptop; is
22  that right?"
23       Your answer:  "Yes, sir."
24       Question:  "Who else used that laptop?"
25       "I'm not -- I'm not sure.  I -- I don't know.  I think

Page 11

1   Jay Vought used it for -- used it there for a while.  I'm not
2   sure anybody else.  I don't know."
3        Okay?
4   A   Okay.
5   Q   I want to ask you the question again.  While you were in
6   H Unit, did you see Kevin Roach often use that laptop?
7   A   No.
8   Q   Why did you testify to those facts last June?
9   A   Because I'm -- just like I told you, I was seeing
10  documents coming from this thing, so I -- I -- I'm assuming he
11  did use that laptop.
12  Q   How certain are you that Kevin Roach was using the laptop?
13  You're close to hundred percent, aren't you?
14  A   Well, most of the documents that was coming from that
15  laptop was his.
16  Q   Okay.  Did he ever come to anybody there and say, "Hey, I
17  don't know how to turn this thing on.  Can somebody help me
18  turn this on?"
19  A   He may have talked to the staff down there, yes.
20  Q   Well, do you know that or --
21  A   No, I don't know that.
22  Q   As far as you knew, Kevin Roach was fully capable of
23  operating that laptop, right?
24  A   I don't know.  I'm assuming he was because he was
25  providing me documents.

Page 12

1   Q   Why did you testify when you were asked that question last
2   June that your belief was that Kevin Roach often used that
3   laptop; is it based on the documents?
4   A   Right.  He was putting out a lot of documents.
5   Q   Well, how were the documents generated?  Did he have a
6   printer as well?
7   A   No.
8   Q   Okay.  Well, then how were they generated?
9   A   Usually Danine Adams would take the diskette down there,
10  and we would download it onto the diskette, and she would take
11  it back to her office, you know, and then we would -- we would
12  deal with it there.
13  Q   And these are documents created by Kevin Roach, right?
14  A   Yes.
15  Q   That you and Danine would download from the laptop
16  computer?
17  A   Yes.
18  Q   Okay.  Wouldn't that raise any doubt in your mind as to
19  whether Kevin Roach was operating a computer?
20  A   Right, and that's why I'm saying I'm assuming he was, but
21  I've never physically seen him.
22  Q   By the way, Kevin Roach was free to sit at that laptop if
23  he chose for as long as he wanted to during the day, right?
24  A   Yes.
25  Q   And he was not being carefully supervised throughout the

Page 13

1   day; would you agree with that?
2   A   There were two staff assigned to the unit.
3   Q   Who?
4   A   Lieutenant Smith and Counselor White.
5   Q   How often were you in the unit?
6   A   Well, you know, that's a wide-open question.  I don't
7   know -- I mean, I can't answer how many times I was actually in
8   that unit.
9   Q   A lot, right?
10  A   No, not a lot.  I couldn't afford to be.
11  Q   There was a filing cabinet in the research room; is that
12  right?
13  A   Yes.
14  Q   And the filing cabinet was for Kevin Roach's and the other
15  inmates' use?
16  A   Yes.
17  Q   Okay.  And they stored documents in there?
18  A   Yes.
19  Q   What kind of documents did they store in there?
20  A   I think it were the documents they were working on.
21  Q   When you say you think, do you know that for a fact?
22  A   No.
23  Q   Okay.  Is it uncommon there at the ADX for a group of
24  inmates to have their own filing cabinet where they stored
25  documents, period; is that unusual?

4 (Pages 10 to 13)

CR 02-938(E)-DOC       June 7, 2006

Page 14

1    A   Yes.
2    Q   Can you think of a single other time when a filing cabinet
3    has been provided to a group of inmates for their use?
4    A   Yeah, UNICOR has -- they have file cabinets. Their clerk
5    down there, they have their own little one that they maintain
6    their records in. I mean, it does happen, the file cabinet.
7    Q   Can you testify with any degree of certainty exactly what
8    kind of documents were being stored in this filing cabinet in
9    the research room?
10   A   Well, I'm assuming it was the ones that you've all seen.
11   I mean, a lot of them were in handwritten -- written notes,
12   the staff compromised how to introduce drugs in the -- the
13   penitentiaries, those kinds of things.
14   Q   How many occasions did you sit down and speak to Kevin
15   Roach while he was in H Unit?
16   A   You never sat down specifically with one because they were
17   all out and about, so you kind of talked to them all.
18   Q   How many times did you talk to Kevin Roach in H Unit?
19   A   I can't answer that.
20   Q   A lot, right?
21   A   No.
22   Q   Where are the reports that you generated from your
23   conversations with Kevin Roach from May of 1998 until now?
24   A   I would say they -- there was none that I did, personally.
25   Q   So you never actually sat down, put a pen to a piece of

Page 15

1    paper and wrote down something that Kevin Roach was telling
2    you; is that right?
3    A   Right.
4    Q   In addition to the documents that were brought into H Unit
5    for the inmates' review, did you ever bring in personal items
6    belonging to other inmates outside of this packet that you've
7    described for their review?
8    A   Not that I recall.
9    Q   Okay. What about Barry Mills' personal address book? Did
10   you have --
11   A   Yeah, it could have been part of that -- that packet that
12   Mike Halualani sent in. I can't answer that side of it, what
13   was brought in on his behalf.
14   Q   All right. I understand that. But I'm asking you just on
15   that one item --
16   A   Right.
17   Q   -- do you recall having ever shown inmates in H Unit Barry
18   Mills' personal address book?
19   A   No.
20   Q   Okay. Have you ever seen Barry Mills' personal address
21   book?
22   A   I may have seen a copy of it --
23   Q   And let me get a time frame for you. Back in '99, 2000,
24   not in preparation for this testimony that you're offering, but
25   back then, in '99 or 2000, at that time period did you ever

Page 16

1    look at Barry Mills' personal address book?
2    A   See, I'm more apt to think that I looked at a copy of it
3    than anything, because we tried to make photocopies of their
4    photo items, so I may have gone to the info file and make a
5    copy of it.
6    Q   Did you introduce a copy of Barry Mills' personal address
7    book into H Unit for Kevin Roach and the others to look
8    through?
9    A   No.
10   Q   And why wouldn't you have done that? Is there some
11   concern about introducing such an address book?
12   A   I don't know what benefit that would have been. I mean, I
13   feel that my SIS tech is just as knowledgeable about the Aryan
14   Brotherhood because they track them on a daily basis. I think
15   she would have been able to extract what was within those.
16   Now, he may have conveyed to us, "hey, you may want to look at
17   these address books, look at birth dates, look at various
18   things within the address book, you know, to help us along,"
19   but I mean, we never would have showed it. I mean, there was
20   no reason for that.
21   Q   You understand that there's been allegations made by Danny
22   Weeks that address books were shown to the inmates in H Unit?
23   A   I am not aware of that.
24   Q   Okay. Isn't there a danger in showing inmates, such as
25   Kevin Roach -- you know his history, right?

Page 17

1    A   Yes.
2    Q   -- personal information about Barry Mills' family, for
3    example? That would be a bad idea, wouldn't it?
4    A   Does he have a family?
5    Q   Who?
6    A   Barry Mills.
7    Q   Yes, he does.
8        Wouldn't it be a bad idea for Kevin Roach to have
9    access to that type of information?
10   A   Boy --
11   Q   Let me approach with a document.
12       Your Honor, I've marked this Defendant's 1081. This
13   is --
14       THE COURT: 1081.
15       MR. FLEMING: This is at Bates Stamp A08053.
16       (Attorney discussion held off the record.)
17       THE COURT: I am not aware of what it is, Counsel. I
18   don't have a copy.
19       MR. FLEMING: I only have this copy. Would your Honor
20   like to look before I provide it to the witness or --
21       THE COURT: It depends if there is an objection or
22   not. If there's not, then I have no concerns. If there is,
23   then I need to see it.
24       MS. FLYNN: No objection, your Honor.
25       THE COURT: All right. You may proceed.

5 (Pages 14 to 17)

Jane C.S. Rule, CSR No. 9316 - Federal Official Court Reporter

*Vol 2 Shott*

CR 02-938(E)-DOC      June 7, 2006

Page 38

1   A   No, I don't --
2   Q   Are you familiar with it?
3   A   Yes.
4   Q   All right. And does it appear that whoever prepared this
5   document, at least this portion of it, had access to PARAGON?
6   A   I -- it -- it does.
7   Q   Okay. Moving to the next section beneath the -- the names
8   and the dates, do you see a whole series of number -- of names
9   followed by digits, and I'll point to you just highlighting for
10  no particular reason the name "Gerald Gilbert" and then a
11  five-digit number followed by a hash followed by a three-digit
12  number; do you see that?
13  A   Yes.
14  Q   Okay. What -- first of all, do you know who
15  Gerard Gilbert is?
16  A   No.
17  Q   All right. Do you know -- what does it appear to be to
18  you, these digits that follow his name?
19  A   That's a register number. It -- it looks like a register
20  number.
21  Q   What is a register number?
22  A   An inmate has -- I mean, once they come into the system,
23  they are given a register number, which consists of eight
24  numbers.
25      MR. FLEMING: And your Honor, I think we have a

Page 39

1   similar stipulation between the parties that the numbers that
2   follow the names in this portion of the document are registered
3   numbers, and the parties agree that they are accurate numbers
4   that relate to the inmate's name preceding the number.
5       THE COURT: Is this stipulated to by the government?
6       MS. FLYNN: Yes, your Honor.
7       THE COURT: All right. It's binding upon us. Thank
8   you.
9   BY MR. FLEMING:
10  Q   Now, will you agree that there are maybe 20 names with
11  numbers that follow?
12  A   Yeah.
13  Q   Okay.
14  A   Yes.
15  Q   And is this information available through the use of the
16  PARAGON system? Can you -- can you identify register numbers?
17  A   Yeah, because you -- yes.
18  Q   Okay. And so whoever wrote this document and for whatever
19  reason, does it appear that the information contained on it
20  came from the PARAGON system?
21  A   Oh, no, it could have come from numerous -- numerous
22  things.
23  Q   Where else?
24  A   I mean, a register number, Jeez, I mean, there's several
25  documents that -- that contain register numbers.

Page 40

1   Q   Among the documents would be the PARACON system?
2   A   Yes.
3   Q   Okay. Finally, the last entry that was made down at the
4   bottom to the right, the last highlighted portion, do you see
5   the letters "FLMB-I" followed by some digits?
6   A   Yes.
7   Q   All right. What does that represent?
8       THE COURT: I'm sorry, Counsel, point to that, would
9   you please?
10      MR. FLEMING: I'm sorry, Judge.
11      THE COURT: All right. Thank you.
12      THE WITNESS: I'm not -- I'm not sure on the -- the
13  "FLMB-1" looks like a Sentry cite, so each Sentry is identified
14  by FLMB-1 --
15  BY MR. FLEMING:
16  Q   All right.
17  A   FLMB-2, B-3.
18  Q   And -- and just so we're perfectly clear about that, the
19  Sentry system is an entirely separate system from the PARAGON
20  system, right?
21  A   Yes.
22  Q   And in order to access PARACON and Sentry, you need to be
23  authorized, right?
24  A   Sentry. Now, PARACON information will be just maintained
25  in the SIS shop.

Page 41

1   Q   All right. The -- where within the ADX would you be able
2   to access the Sentry system?
3   A   Any terminal.
4   Q   Any computer terminal?
5   A   Yes.
6   Q   Okay. Now, FLMB-1, it represents Florence, right?
7   A   Can I -- can I go back to that?
8   Q   Sure.
9   A   It's not every -- not every terminal has Sentry. It's --
10  we identify who needs Sentry, so a counselor, Counselor White
11  in H Unit would have had access to it, but not every --
12  Q   All right.
13  A   -- terminal has it.
14  Q   Well, that -- that's a good point.
15      The computer that was within the H Unit in
16  Counselor White's office, that computer had access to Sentry?
17  A   Yes.
18  Q   All right. "BI," is that a bed index? Is that what that
19  stands for?
20  A   I don't know. I think it's just a Sentry cite that our
21  computer specialist --
22  Q   And do you see how it's followed by a series of numbers,
23  530-07; do you see that?
24  A   Yes.
25  Q   And is that significant to you in any way?

11 (Pages 38 to 41)

CR 02-938 DOC          3/22/2006 AB2006-03-22 D7V1 Trial

## Page 46

1  A.  Yes.
2  Q.  Above your name, does it state, "I declare under
3  penalty of perjury that the foregoing is true and correct"?
4  A.  Yes.
5  Q.  And you signed your name to it?
6  A.  Yes.
7  Q.  And so is it fair to say that the information that
8  you've set forth in this petition's truthful?
9  A.  Yes.
10 Q.  And accurate?
11 A.  Yes.
12 Q.  And complete?
13 A.  I believe so.
14 Q.  Essentially, you filed this because you were unhappy
15 with the reduction of your sentence that you received from
16 the government for the cooperation that you provided, true?
17 A.  Are you speaking about the 5K1.1?
18 Q.  Yes.
19 A.  No.  That's not why I filed it.
20 Q.  How about the Rule 35?
21 A.  Yes.
22 Q.  You were unhappy --
23 A.  -- that I haven't received one.
24 Q.  The fact that you had not receive one, right?
25 A.  Yes.

## Page 47

1  Q.  Let's talk about what you received before you filed
2  this petition.
3     You appeared for sentencing on the Arva Lee Ray murder,
4  right?
5  A.  Yes.
6  Q.  You entered a plea of guilty?
7  A.  Yes.
8  Q.  You were looking at a natural life sentence?
9  A.  Yes.
10 Q.  No chance of ever being released from prison?
11 A.  Are you talking about at my sentencing hearing?
12 Q.  What you were initially facing --
13 A.  Oh, yes.
14 Q.  -- was life without possibility of release.
15 A.  Yes.
16     THE COURT:  Just a moment.  We can't get both of
17 you.  You're talking over the top of each other.  Strike the
18 answer.  Strike the question.
19     MR. FLEMING:  Start again?
20     THE COURT:  Re-ask it.
21     MR. FLEMING:  Okay.
22 BY MR. FLEMING:
23 Q.  When you were charged with the murder of Arva Lee Ray,
24 you were facing life in prison without the possibility of
25 release, true?

## Page 48

1  A.  Yes.
2  Q.  Okay.  You cooperated with the government, right?
3  A.  Yes.
4  Q.  You testified against Mr. Filkins at his trial?
5  A.  Yes.
6  Q.  Okay.  You appeared before a judge for sentencing?
7  A.  Yes.
8  Q.  You were given a sentence by the judge of 14 years; is
9  that right?
10 A.  Yes.
11 Q.  Okay.  And that's from "natural life" down to 14 years,
12 right?
13 A.  Yes.
14 Q.  And that was because the government, at the time of
15 your sentencing, stood up and made a recommendation to the
16 court that your sentence should be reduced for substantial
17 assistance, right?
18 A.  Yes.
19 Q.  And that was under the provision in the guidelines,
20 5K1.1, right?
21 A.  I believe so, yes.
22 Q.  Now, you were unhappy with the fact that you were never
23 given a Rule 35 following that fourteen-year sentence you
24 received, right?
25 A.  Years later, yes.

## Page 49

1  Q.  And that's what prompted you to file this petition, to
2  correct that error in your mind, right?
3  A.  Yes.
4  Q.  The reason that you state in the petition why your
5  sentence should be set aside was that the conviction was
6  obtained by the unconstitutional failure of the prosecution
7  to disclose evidence favorable to the defendant; isn't that
8  right?
9  A.  I checked two or three different things.
10 Q.  Is that one of the ones that you wrote out in typeset?
11 A.  One moment, please.
12 Q.  Go to page 5.
13 A.  Yes.
14 Q.  That's what you typed out; right?
15 A.  Yes.
16 Q.  And you also typed out above that on page 5 your
17 conviction was obtained by a plea of guilty which was
18 unlawfully induced.  Is that what you wrote?
19 A.  Yes.
20 Q.  And you're talking about your conviction on the
21 Arva Lee murder, right?
22 A.  Yes.
23 Q.  And your position to the court was that that plea was
24 unconstitutionally, unlawfully induced; isn't that right?
25 A.  Yes.

Debbie Gale, CSR 9472, Federal Official Court Reporter

c5529a6d-efbf-4b53-810c-4bb9b6d4799d

CR 02-938 DOC                 3/22/2006 AB2006-03-22 D7V1 Trial

| Page 50 | Page 52 |
|---|---|
| 1  Q.  Based on false promises made to you by the prosecutors<br>2  in the case?<br>3  A.  What I thought was a false promise.<br>4  Q.  Okay.  Well, let's take a look at the statement of<br>5  facts you filed in this petition.  It's on page 8 of the<br>6  petition.<br>7  Q.  Are you with me?<br>8  A.  On the statement of facts?<br>9  Q.  Yeah.  Now, you wrote out a statement of facts, right?<br>10  A.  Yes.<br>11  Q.  And this is also penalty of perjury, correct?<br>12  A.  Yes.<br>13  Q.  And everything in this statement of facts is true?<br>14  A.  I believe so.<br>15  Q.  It was true then, right?<br>16  A.  Yes.<br>17  Q.  And its true today?<br>18  A.  I believe so.<br>19  Q.  Now, in addition to the Arva Lee Ray murder, you<br>20  were also asked by Mr. Jessner to provide substantial<br>21  assistance in a second homicide, right?<br>22  A.  Yes.<br>23  Q.  And that involved the murder of who?<br>24  A.  "Sting 'Em."  Steve.  Steve Mejaski.<br>25  Q.  "Sting 'Em" is his nickname? | 1  A.  Yes.<br>2  Q.  And essentially what happened was you were told by<br>3  Mr. Rogers that Sting 'Em was going to be murdered for<br>4  stealing a radio from somebody's cell, right?<br>5  A.  I don't know if it was the cell or Hobby Craft or<br>6  something, but the radio, yes.<br>7  Q.  Okay.  So there was going to be a murder based on the<br>8  theft of a small personal item, right?<br>9  A.  Yes.<br>10  Q.  And this was unrelated to the Aryan Brotherhood?<br>11  A.  Yes.<br>12  Q.  Okay.  So people die in prison for all kinds of silly<br>13  reasons, right?<br>14  A.  Yes.<br>15  Q.  Turns out that you witnessed the murder?<br>16  A.  Yes.<br>17  Q.  And you met with the prosecutor and said, "I'd like to<br>18  provide you with substantial assistance about this murder in<br>19  exchange for a reduction of my sentence," right?<br>20  A.  I don't know whether I approached them with this<br>21  information or they asked me about -- specifically about it,<br>22  at which point I just told 'em that, yes, I knew.  I'm not<br>23  certain as to how it was initiated to begin with.  But at<br>24  some point in time, it was agreed that I would testify on<br>25  this trial. |

| Page 51 | Page 53 |
|---|---|
| 1  A.  In parentheses, "Sting 'Em."  That was his nickname.<br>2  Q.  Now, this is unrelated to the Arva Lee Ray murder?<br>3  A.  Yes.<br>4  Q.  But it just so happened that the prosecutor,<br>5  Mr. Jessner, was handling that case as well?<br>6  A.  Yes.<br>7  Q.  And you were working to reduce your sentence of<br>8  fourteen years by providing additional information in this<br>9  other murder case, right?<br>10  A.  Would you say that once more, please?<br>11  Q.  Okay.  You were still cooperating with the government<br>12  in an effort to reduce the fourteen-year sentence that you<br>13  received for the Arva Lee Ray murder?<br>14  A.  Yes.<br>15  Q.  And you were hoping to do, as we talked about earlier,<br>16  a Rule 35?<br>17  A.  Yes.<br>18  Q.  And you met with, as you point out in your statement of<br>19  facts, the prosecutor, Mr. Jessner, right?<br>20  A.  Yes.<br>21  Q.  And just so we understand what it is that you're<br>22  providing:  You had some information about this murder,<br>23  right?<br>24  A.  Yes.<br>25  Q.  And you implicate a gentleman named Larry Rogers? | 1  Q.  Well, in your statement of facts, don't you tell the<br>2  judge that you're writing to, that the Rule 35 had actually<br>3  been promised to you before you testified in the Arva Lee<br>4  Ray murder?  Isn't that right?<br>5  A.  No.<br>6  Q.  You never said that?<br>7  A.  I don't believe I did.  I believe what I said is that<br>8  it was -- it was a possibility that I could receive it.<br>9  What -- my plea agreement stated that it -- it was at the<br>10  dis-- it was at the discretion of the United States<br>11  Attorney's Office, that they had the authority to file a<br>12  Rule 35(b) at some point in time.<br>13  Q.  In your statement of facts, don't you tell the judge<br>14  that prior to testifying in the Arva Lee Ray homicide,<br>15  Prosecutor Jessner told you that, in addition to the 5K<br>16  motion, there would be, in quotes, "a very significant<br>17  reduction" for your cooperation later on?  Isn't that what<br>18  they told you?<br>19  A.  That's not accurate.<br>20  Q.  That's not accurate?<br>21  A.  No.<br>22  Q.  Okay.  If you turn in the statement of facts -- go to<br>23  the second page of the statement of facts.<br>24       When did you testify, by the way, in the Arva Lee Ray<br>25  homicide trial against Glen Filkins? |

Debbie Gale, CSR 9472, Federal Official Court Reporter

c5529a6d-efbf-4b53-810c-4bb9b6d4799d

CR 02-938 DOC                  3/22/2006 AB2006-03-22 D7V1 Trial

Page 54

1  A.  I believe that was August of 1994.
2  Q.  It was in August of '94?
3  A.  I believe it was, yes.
4  Q.  Now, you had a meeting on January 13th of 1994 with
5  Prosecutor Jessner and the FBI agent, right?
6  A.  Is that that one group meeting you're talking about
7  where everyone was there?
8  Q.  In your statement of facts on page 2, last paragraph,
9  you write: "On or about January 13th, 1994, I attended a
10 meeting held at the Metropolitan Detention Center,
11 Los Angeles."  Do you see that?
12 A.  Yes.
13 Q.  (Reading:) "Present for this meeting were my
14 court-appointed attorney, Michael Treman, FBI Agent Thomas
15 Mansfield of the Santa Maria field office AUSA's" --
16 U.S. Attorneys -- Assistant U.S. Attorneys -- "Gregory
17 Jessner and Sally Meloch."
18     And a Mr. -- is that "Scheper"?
19 A.  Yes.  That's just a phonetic spelling.  I didn't know
20 how it was spelled.
21 Q.  So there was a meeting between all of you on
22 January 13th of 1994?
23 A.  Well, this was a debriefing.  This is when I saw
24 everybody for the first time together.
25 Q.  Okay.

Page 55

1  A.  Yes.
2  Q.  Okay.  A debriefing.  And this is before you testified
3  in the Arva Lee Ray homicide against Glenn Filkins?
4  A.  Yes.
5  Q.  Go to the next page.
6  A.  (Witness complies.)
7  Q.  (Reading:)  "The government offered the following plea
8  agreement terms:
9      "(1) I would plead guilty to aiding and abetting in a
10 murder conspiracy.
11     "(2) For pleading guilty in a timely manner, I would
12 receive a three-point downward departure from the base
13 guidelines offense level."
14     Right?
15 A.  Yes.
16 Q.  (Reading:)  "(3) I would cooperate with the government
17 and they would, in turn, submit a 5K1.1 motion at my
18 sentencing hearing."
19     Right?
20 A.  Yes.
21 Q.  (Reading:)  "I would immediately be placed into the
22 witness security protection program while my wife and
23 children would be relocated at a later date."
24     Right?
25 A.  Yes.

Page 56

1  Q.  Now, here's the important one, Number 5, "After I
2  assisted in the Mugrage trial" -- M-U-G-R-A-G-E.
3      Is that Mugrage?
4  A.  Mugrage.
5  Q.  -- "Mugrage trial, Assistant U.S. Attorney Jessner and
6  Meloch would submit a Rule 35 motion for what they described
7  as a," in quotes, "'very significant sentencing reduction,'
8  over whatever sentence I received at my initial sentencing."
9      Isn't that what you wrote --
10 A.  Yes.
11 Q.  -- in your statement of facts?
12 A.  Yes.
13 Q.  Yes?
14 A.  Yes.
15 Q.  Under oath?
16 A.  Yes.
17 Q.  To the judge?
18 A.  Yes.
19 Q.  And it was true then, right?
20 A.  Yes.
21 Q.  And it's true today?
22 A.  Yes.
23 Q.  By the way, when you testified in the Arva Lee Ray
24 murder trial against Glenn Filkins, you never told the jury
25 that you were also being offered a Rule 35?

Page 57

1  A.  At that time I wasn't.
2  Q.  Weren't you offered a Rule 35 on January the 13th of
3  1994?
4  A.  No.
5  Q.  Didn't they tell you that you were going to get a very
6  significant, in quotes, "reduction" from your sentence?
7  A.  Yes.
8  Q.  Is that a promise?
9  A.  Yes, it was to me.
10 Q.  Okay.  So you thought you were promised a Rule 35?
11 A.  Yes.
12 Q.  Before you testified in the Arva Lee Ray murder trial?
13 A.  No.  Before I testified in the Mugrage trial.
14 Q.  Okay.  Now, you go on in your statement of facts to
15 talk more about this meeting that occurred with the
16 prosecutor, Gregory Jessner, and the others, right?
17 A.  Excuse me?
18 Q.  Let's turn to page 7 of your statement of facts.
19 A.  I don't have these numbered, sir.
20 Q.  Okay.  Well, just flip over two more pages from where
21 you are.
22 A.  All right.
23 Q.  Is the top of your document "over the next 28 months or
24 so"?
25 A.  Yes.

Debbie Gale, CSR 9472, Federal Official Court Reporter

c5529a6d-efbf-4b53-810c-4bb9b6d4799d

CR 02-938 DOC                    3/22/2006 AB2006-03-22 D7V1 Trial

Page 58

1 Q. Okay. Now, next, move to January 6th of 1997. You're
2 still in custody at this time, right?
3 A. Yes.
4 Q. And you're serving out the fourteen years that you
5 received?
6 A. Yes.
7 Q. And you're still hoping to bring that down further with
8 the Rule 35 that you'd been promised, right?
9 A. Yes.
10 Q. Okay. So you were brought in Los Angeles in order to
11 testify against Mugrage in the stabbing death of Stink 'Em,
12 right?
13 A. Yes.
14 Q. And you met with Prosecutors Jessner and Meloch again,
15 right?
16 A. Yes.
17 Q. And the purpose of this was to review your testimony
18 before they put you on the stand in front of the jury,
19 right?
20 A. Yes.
21 Q. And they started the meeting by telling you that it was
22 imperative that you give an impressive performance for the
23 presiding judge, right? They told you that?
24 A. Not as a stand-alone statement.
25 Q. Well, we'll get to the other statements in a moment.

Page 59

1    Standing alone, is that one of the statements they made
2 to you?
3 A. Standing alone?
4 Q. Yes.
5 A. No, no. This was just part of a conversation.
6 Q. All right. Let me read this statement that you've
7 included in your statement of facts, and tell me if this is
8 what you wrote at the time?
9 A. Yes.
10 Q. (Reading:) "They started the meeting by telling me
11 that it was imperative I give an impressive performance for
12 the presiding judge, the Honorable David Kenyon, as he was
13 now the judge hearing and making the decision on my upcoming
14 Rule 35 motion."
15    Is that what you wrote?
16 A. Yes.
17 Q. Period?
18 A. Yes.
19 Q. Then you write, "I was instructed on how to sit, not to
20 offer any information that I was not directly asked for, to
21 answer in as few words as possible, and don't forget to make
22 plenty of eye contact with the jury,"
23    Is that what you wrote?
24 A. Yes.
25 Q. Is that what they instructed you to do?

Page 60

1 A. Yes.
2 Q. Yesterday, I noticed that you were making very good eye
3 contact with the jury. Is that based on what you'd been
4 instructed back in this meeting?
5 A. No. I was speaking to them, and I thought it rude not
6 to look at them.
7 Q. So you didn't need that particular instruction from the
8 government?
9 A. Not that particular one, no.
10 Q. Okay. But, nevertheless, they gave it to you?
11 A. Yes.
12 Q. Now, they began to get into -- after they gave you
13 these preliminary instructions to look at the jury, don't
14 offer information that's not asked of you, they got into the
15 details of what it was you were gonna testify to, right?
16 A. Yes.
17 Q. And you explained to them that "I am going to testify
18 that Larry Rogers told me about Sting 'Em's impending
19 murder," right?
20 A. Yes.
21 Q. You were then instructed by the prosecutors there,
22 including Prosecutor Jessner, that you should omit any
23 mention of Larry Rogers, right?
24 A. Technically, yes. That was -- that was the gist of it,
25 but that wasn't exactly how it was said.

Page 61

1 Q. That's what you wrote in the statement of facts.
2 A. That is the fact. It's just --
3 Q. Did I --
4 A. -- it's a little more abbreviated.
5 Q. Did I misread a single word from your statement of
6 facts?
7 A. No.
8 Q. That's exactly what you wrote?
9 A. Yes.
10 Q. And it was true then?
11 A. Yes.
12 Q. Right?
13 A. Yes.
14 Q. It's true today, isn't it?
15 A. It hasn't changed.
16 Q. Then you say that, "AUSA" -- which is a U.S. Attorney
17 Gregory -- "Jessner and Agent Paine also suggested that it
18 would be better for all concerned if I were to forget about
19 him altogether."
20    That's what you wrote?
21 A. Yes.
22 Q. Word for word?
23 A. Yes.
24 Q. They were telling you to lie to the jury, right?
25 A. No.

16 (Pages 58 to 61)

Debbie Gale, CSR 9472, Federal Official Court Reporter

c5529a6d-efbf-4b53-810c-4bb9b6d4799d

Page 62

1  Q. Were they telling you to forget information that you
2  knew?
3  A. I felt they were asking me to withhold information.
4  Q. And that caused you much alarm and concern, right?
5  A. Yes.
6  Q. Because, as you state in the following page, on your
7  statement of facts, that, in your mind, what Mr. Jessner and
8  Ms. Meloch and Mr. Paine were doing, was they were telling
9  you to provide the court with incomplete testimony, right?
10 A. Yes.
11 Q. And that was your position then, right?
12 A. Yes.
13 Q. And that's your position today?
14 A. Yes.
15 Q. You were -- you never testified in that trial, did you?
16 A. No, I didn't.
17 Q. And, in fact, the prosecutor, Jessner, had a
18 conversation with you on January the 14th of 1997, right?
19 A. Sometime in January, yes.
20 Q. Okay. You were able to reach him by phone from prison?
21 A. Yes.
22 Q. And he told you then that your testimony would no
23 longer be necessary, right?
24 A. Well, we're jumping ahead a little bit. They brought
25 me out here on a Tuesday, I believe. I was detained here

Page 63

1  Wednesday. And I was supposed to go on the stand Thursday,
2  I believe. And I think the defense attorney was sick that
3  day, so they canceled it, and they flew me back -- I believe
4  it was Wednesday, Thursday and Friday -- they flew me back
5  to the location where I was housed at. And Monday morning
6  they came and got me again to bring me back out here,
7  California. And we got as far as the airport, and we were
8  about ten minutes from boarding the plane when we received a
9  cell call telling 'em to take me back, I was no longer
10 needed.
11      THE COURT: When you refer to "that trial," which
12 trial?
13 BY MR. FLEMING:
14 Q. This is the Mugrage trial?
15 A. Larry Mugrage, yes.
16 Q. So you weren't needed any longer, right?
17 A. Right.
18 Q. And this upset you, didn't it?
19 A. Not the fact that I wasn't needed, but the fact that I
20 was told that the Rule 35 was out of their hands, it was up
21 to their boss, because I hadn't testified.
22 Q. And that made you angry?
23 A. Yes.
24 Q. Because they promised you a Rule 35?
25 A. Yes.

Page 64

1  Q. And now they weren't gonna live up to their promises?
2  A. That's what it appeared to be.
3  Q. And the reason that you believed they weren't living up
4  to their promises is because you wouldn't alter your
5  testimony in trial, right?
6  A. I wouldn't lie. I wouldn't withhold information. It's
7  against my plea agreement.
8  Q. And that's what they were asking you to do?
9  A. I felt that's what they were asking me to do.
10 Q. Okay. And that's why you put it in your statement to
11 the judge?
12 A. Yes.
13 Q. You thought that then, right?
14 A. Yes.
15 Q. And you still think that today, right?
16 A. Absolutely. We were at odds. And when you spoke to
17 Mr. Jessner during that phone conversation that you learned
18 that you would not be needed in the trial, didn't he tell
19 you that your testimony would no longer be needed, as the
20 government has elected to go another route and that any
21 testimony that you offered now would be in conflict with
22 what was being presented? Isn't that what Mr. Jessner told
23 you then?
24 A. I don't know if he actually used the word "conflict."
25 He just said they decided to go another route and they no

Page 65

1  longer needed me and my testimony was no longer relevant.
2  Q. What I just read to you, is that what you put
3  word-for-word in your statement of facts?
4  A. That may be exactly what I put. I don't know.
5  Q. Would you like to check?
6  A. Sure. Where am I at?
7  Q. Next page, last paragraph starting with, "On the
8  following day." Are you with me?
9  A. Yes.
10 Q. Why don't you take a moment to read that over and make
11 sure I read that correctly.
12 A. Okay.
13 Q. And did I get that right?
14 A. Yes.
15 Q. And then you were informed about ten days later that
16 not only would you not be called to testify, but that you
17 weren't getting a Rule 35 at all?
18 A. Yes.
19 Q. That made you really upset, right?
20 A. Because of their reasoning, yes.
21 Q. Right. And part of what they told you through your
22 attorney, Mr. Treman, two pages later in your statement of
23 facts, was that according to your attorney you had "pissed
24 them off." That's in quotations.
25      Do you see that? -- middle of the page.

CR 02-938(E)-DOC     March 22, 2006

---

Page 58

1  Q  Known as "Ray O."?
2  A  No.
3  Q  Were you ever --
4  A  Oh, wait a minute.  That does sound familiar.  I can't put
5  a face with him, but I do remember the name "Ray O." somewhere.
6  Q  Okay.  Well, let me see if I -- if I can nail this down.
7      Do you recall being in a WITSEC unit with Ray O. as
8  you prepared for this case; do you remember that?
9  A  I don't know.  It's just a name.  I -- can you put a face
10  with it, please?
11  Q  Well, you recall there was an allegation that you were
12  smuggling drugs, marijuana and heroin, specifically, into the
13  WITSEC unit a few years back; do you remember that?
14  A  There was an allegation?
15  Q  Yes.
16  A  If there was, I've never seen it.
17  Q  Never heard of this?
18  A  No.
19  Q  Did you have a copy of your grand jury testimony with you
20  while you were in that unit?
21  A  Which unit?
22      THE COURT:  In what unit?
23      MR. FLEMING:  In the WITSEC unit.
24      THE WITNESS:  I was in --
25      MS. BLANCH:  Excuse me, your Honor, I'm going to

---

Page 59

1  interrupt.  Can you just caution the witness not to answer
2  about locations of witness security units?
3      THE COURT:  Yes.  And you will not answer any question
4  concerning location.
5      THE WITNESS:  Okay.
6      THE COURT:  But you can answer the question about
7  whether you had a copy of your transcript inside the WITSEC
8  unit, wherever that was.
9  BY MR. FLEMING:
10  Q  Without revealing where the WITSEC unit was, do you recall
11  being in a WITSEC unit with an inmate named "Ray Oechsle," also
12  known as "Ray O."?
13  A  I remember the name.  I cannot put a time frame to it, and
14  I -- I definitely do not have a face to go with it.
15  Q  Next question.
16      While you were in the WITSEC unit, did you have a copy
17  of your grand jury transcript; yes or no?
18  A  Yes.
19  Q  Okay.  And you had that with you in the unit?
20  A  Yes.
21  Q  And you were in the unit with other people who were
22  cooperating in this case; isn't that right?
23  A  I think so, yes.
24  Q  And you showed your grand jury transcript to other
25  witnesses while in that unit, didn't you?

---

Page 60

1  A  No.
2  Q  Okay.
3  A  I showed the Indictment.
4  Q  You had your grand jury transcripts with you?
5  A  Yes.
6  Q  And where did you keep those grand jury transcripts?
7  A  Locked away.
8  Q  Locked away where?
9  A  In my locker in a file, a folder.
10  Q  Accessible to you whenever you wanted to go retrieve them?
11  A  Yes.
12  Q  And you were in a unit where other cooperators were also
13  housed who were cooperating in this case, right?
14  A  Yes.
15  Q  Did they have their grand jury transcripts, also?
16  A  No, that's -- they didn't have the Indictment or the grand
17  jury, and that's why I made the Indictment available.
18  Q  You made the 142-page Indictment available to the other
19  cooperators in this unit; is that right?
20  A  Yes, I let them see it.
21      MR. FLEMING:  That's all I have for now.
22      Your Honor, I do want to move into evidence Exhibit
23  1001, subject to that motion to -- to strike a portion of it at
24  some later time.  That would be the petition filed by
25  Mr. Miller.

---

Page 61

1      THE COURT:  Let's take that up over the lunch hour or
2  this evening, just because it's such a voluminous document.
3      MR. FLEMING:  That's fine.
4      THE COURT:  Let's see which portions of that
5  voluminous document you truly want in and which are relevant.
6      MR. FLEMING:  Very well.  Thank you.
7      THE COURT:  Thank you very much, but you can expect
8  that that's going to be coming in at some point, Counsel.
9      MR. FLEMING:  I appreciate that.  Thank you.
10      THE COURT:  All right.  Thank you.
11      Now, on behalf of Mr. Bingham, Mr. Harris.
12      MR. HARRIS:  Yes, thank you, your Honor.
13      THE COURT:  Thank you.
14      This would be cross-examination on behalf of
15  Mr. Bingham by Counsel, Mr. Harris.
16          CROSS-EXAMINATION
17  BY MR. HARRIS:
18  Q  Mr. Miller, who were the other cooperators in that WITSEC
19  unit that you showed the Indictment to?
20  A  I don't know.
21      MS. BLANCH:  Objection, your Honor.  Can we just check
22  with the witness security program?
23      THE COURT:  I can't hear you, Counsel.
24      MS. BLANCH:  Can we check with the people with witness
25  security to see if that's a security violation?

---

16 (Pages 58 to 61)

CR 02-938 DOC          6/6/2006          AB2006-06-06 D40V1

Page 38

1  Q.  How many times, if you can recall, did you meet with
2  Mr. Smith after that initial meeting?
3  A.  Maybe three times, off the top of my head.
4  Q.  Were you responsible for providing money to cooperating
5  witnesses in this case?
6  A.  Yes, sir.
7  Q.  And the decision to provide money, was that made by
8  you?
9  A.  It was made as a collective -- between the other
10  investigators, or the U.S. Attorney's Office, ATF, and other
11  people.
12  Q.  Okay.  Who were the people involved in that
13  decision-making process?
14  A.  Well, that would be, you know, ATF supervisors who
15  would approve the reports.  All determinations on whether we
16  will supply any funds to a witness or an informant were
17  run -- were run by.  I hate to use that word, the phrase --
18  but run by the Assistant United States Attorney at the time
19  who was handling the case, Greg Jessner.
20  Q.  So then would you make a determination regarding the
21  disbursement of funds to a witness and then run that past
22  Mr. Jessner?  Is that essentially how it would work?
23  A.  I guess, essentially, yeah.
24  Q.  Was there anyone else within the ATF that you consulted
25  with before making that recommendation to Mr. Jessner to

Page 39

1  provide money to these inmate informants?
2  A.  Well, obviously, I'd have to run it through my
3  supervisor.  They are the final approving official on
4  whether or not any funds are distributed or even supplied to
5  the agent who requests it.
6  Q.  Okay.  Now, in regards to Mr. Smith, you provided
7  Mr. Smith with some funds; is that right?
8  A.  That's correct.
9  Q.  And this was while Mr. Smith was obviously
10  incarcerated, right?
11  A.  Yes, sir.
12  Q.  Okay.  And did you make the decision to provide
13  Mr. Smith with funds after the first meeting?  When was the
14  decision made? -- is a better question, I think.
15  A.  I'm not sure it's that clear-cut.  I provided Mr. Smith
16  funds probably pretty close after the first meeting because,
17  in my opinion -- and which was also run through the
18  U.S. Attorney's Office -- I paid them for information.  I
19  paid for time.  I don't pay for the fact that I get a
20  conviction or I get -- when I do a search warrant that I
21  find something during the search warrant.
22      It's all about time and information.  Much like you
23  have billable hours, our belief is that, you know, time's
24  valuable to them.  I realize they're in prison, but it still
25  is their time.

Page 40

1  Q.  Mr. Smith was serving a lengthy sentence back when you
2  first met him; is that correct?
3  A.  I believe, yeah.  Probably 65-to-life or something.
4  Q.  And you wanted to compensate him for the time he spent
5  with you in discussing the case?
6  A.  Yes, sir.
7  Q.  Now, you paid Mr. Smith approximately $1400,
8  thereabouts; is that right?
9  A.  Yeah, that -- if you say so, sir.  Off the top of my
10  head, I don't know.
11  Q.  Now, how was the initial payment to Mr. Smith made?
12  A.  Um --
13  Q.  How did you get the money to Mr. Smith the first time
14  you started to pay Mr. Smith for his time?
15  A.  Oh, I checked the money out from ATF.  It's approved.
16  I get the money, go to the United States Post Office, get a
17  U.S. Postal Service Money Order, fill out an envelope, and
18  mail it to the institution, and they put it on his books or
19  in his account.
20  Q.  Do you recall how much the first payment was to
21  Mr. Smith?
22  A.  I don't.  It might have been $200, but I don't know.
23  Q.  Do you keep records of the payments you're making to
24  these inmate informants?
25  A.  ATF does, yes.

Page 41

1  Q.  Do you have those records?
2  A.  Not with me, no, sir.
3  Q.  Is there a set of records that would show each
4  disbursement of a particular check to a particular
5  informant?
6  A.  Yes, sir.
7  Q.  And the time --
8  A.  Yeah, the date.
9  Q.  Best you can recall, was Mr. Smith paid over a period
10  of time?
11  A.  I'm sure he was provided funds for a -- up until --
12  most recently, I think he was provided funds a few months --
13  a few weeks ago.
14  Q.  Okay.  He, Clifford Smith, testified, as you probably
15  know, early on in the case --
16  A.  Yes, sir.
17  Q.  -- are you aware of that?
18      And do you know whether or not, after he testified here
19  in Court, whether he was provided with any additional funds
20  since his testimony?
21  A.  Yes, sir.
22  Q.  How much was he provided since his testimony?
23  A.  I believe he was given $50.
24  Q.  And did you provide him with that?
25  A.  Either I did or the agent who is now assisting in a

Debbie Gale, CSR 9472, Federal Official Court Reporter

6c531450-2b56-43d7-b893-8d2d8df71d94

*Vol 1 Halunhui*

CR 02-938 DOC                    6/6/2006                    AB2006-06-06 D40V1

Page 42

1  trial that is scheduled to begin in October.
2  Q.  Mr. Smith is still, then, a government informant
3  witness; is that right?
4  A.  Yeah, as of right now, yes, sir.
5  Q.  So at this stage, he's still working for the government
6  in preparation of another trial that's scheduled in October?
7  A.  Yes, sir.
8  Q.  All right.  Have you reviewed Mr. Smith's testimony
9  from this trial, by any chance?
10  A.  I have not.  I've just gotten synopses from the
11  government's trial team.
12  Q.  In regards to Mr. Smith's credibility, I take it from
13  your answers that Mr. Smith is still being provided money by
14  the government since his testimony here?
15  A.  Yes, sir.
16  Q.  And that he's still, as far as you're aware, going to
17  be used to testify in another prosecution that's going to
18  take place in October?
19  A.  As far as I am aware.
20  Q.  All right.  And you have consulted, then, with the
21  respective prosecutors in that case?
22  A.  Yeah.  I mean, I make no determinations on who
23  testifies.  I'm the case agent.  So that's a question that
24  probably should be referred to the prosecuting attorney.
25  Q.  Okay.  Did you provide a letter to the parole board on

Page 43

1  behalf of Mr. Smith?
2  A.  No.
3  Q.  Were you involved in a discussion about providing a
4  letter to the parole board with Mr. Smith?
5  A.  I'm sure that I -- if there was one, I'm sure that I
6  probably was.  I don't recall one specifically.
7  Q.  When such a promise is made, assuming -- and I
8  understand you don't remember specifically whether you did
9  this in regards to Mr. Smith -- but assuming there was a
10  promise made to Mr. Smith along those lines, would there be
11  a record kept of you having made that promise, if one was
12  made by you?
13  A.  Would I have -- would I have kept a record?
14  Q.  Yes.
15  A.  No.
16  Q.  All right.  So, for example, you might be having a
17  discussion with Mr. Smith about his parole
18  board hearing; and if you were to say to Mr. Smith, "I am
19  going to provide a letter to the parole board on your behalf
20  as part of your compensation for cooperating," would you
21  note that somewhere in a report, in a log, anything like
22  that?
23  A.  No.
24  Q.  Was Mr. Smith, to your knowledge, granted immunity from
25  prosecution in exchange for his agreement to come in here

Page 44

1  and testify?
2  A.  According to Mr. Smith, we -- the government in this
3  case did not provide him with immunity.  But according to
4  Mr. Smith, he stated that he was provided immunity by the
5  government in the early 1990's, prior to my investigation.
6  That was my understanding.
7  Q.  Did you ever have any discussions with Mr. Smith about
8  the issue of immunity in regards to his testimony in this
9  case?
10  A.  No.
11  Q.  Let's turn to Glen "Speedy" West.  Do you know
12  Mr. West?
13  A.  Yes, sir.
14  Q.  When did you first meet Mr. West?
15  A.  I want to say November of 2003, or maybe -- somewhere
16  in 2003, summer, fall.
17  Q.  When you first met Mr. West, was he a -- was he charged
18  in this case?
19  A.  Yes, sir.
20  Q.  He was a defendant charged in the 110-page indictment;
21  is that right?
22  A.  Yes, sir.
23  Q.  Where were you when you first met Mr. West?
24  A.  I want to say he was released to me at the Santa Ana
25  City Jail.

Page 45

1  Q.  When you say he was released to you, what do you mean
2  by that?
3  A.  Mr. West had pled -- I want to say -- and, you know,
4  I'm just trying to recall off the top of my head.  I want to
5  say Mr. West had pled guilty in U.S. District Court and had
6  been released, and was released to -- and I picked him up at
7  the Santa Ana Jail prior to interviewing him for the first
8  time.  I want to say that's how I remember it.
9  Q.  Prior to picking up Mr. West at the Santa Ana Jail,
10  were you involved in any discussions about Mr. West becoming
11  a cooperator in this case with anyone?
12  A.  Yeah, probably.  I mean, off the top of my head, I
13  don't recall.
14  Q.  Now, Mr. West was released from prison, or from this
15  case, and from jail one week prior -- let me start over
16  again.
17      Mr. West entered a plea agreement and then was released
18  about a week later; is that right?
19  A.  Yeah.  I mean, I don't really know for sure what the
20  time frame was.
21  Q.  And do you know whether his release from custody had
22  anything at all to do with his agreement to provide
23  information in this case?
24  A.  I would guess it did.
25  Q.  Okay.  You knew that before he entered a plea that he

12  (Pages 42 to 45)

*V01 #1  Haluhan!*

CR 02-938 DOC             6/6/2006          AB2006-06-06 D40V1

---

Page 50

1   A.  First time I ever spoke to Mr. Miller was on the
2   telephone.
3   Q.  You conducted a number of interviews with a variety of
4   inmate informants by phone, right?
5   A.  Majority of 'em, yes, sir.
6   Q.  All right.  And did you ever meet with Mr. Miller in
7   person in addition to the phone call?
8   A.  I want to say I met Mr. Miller just prior to his
9   Grand Jury testimony in Los Angeles.  And I wouldn't know
10  what the date of that was, but that would have been the
11  first time I met him in person.
12  Q.  Did Mr. Miller receive any funds from you or through
13  you as part of his compensation for testifying?
14  A.  Yes, sir.
15  Q.  And how much did Mr. Miller receive from you?
16  A.  I don't know off the top of my head.
17  Q.  All right.  Did Mr. Miller also receive a substantial
18  reduction in his sentence?
19  A.  I believe he did receive like an 18-month reduction in
20  his sentence.
21  Q.  Do you know whether Mr. Miller was granted immunity
22  from further prosecution in connection with the charges
23  contained in this indictment?
24  A.  I -- he -- for this particular case, I don't think he
25  was ever given immunity.  I think he believed he had

---

Page 51

1   immunity from his previous testimony from the government in
2   the murder of "Baby" Ray Arva.
3       But I don't really deal with immunity issues.  That's
4   the U.S. Attorney's Office function.
5   Q.  Were you present during a conversation with Mr. Miller
6   in which he was told that he would not be prosecuted further
7   for any involvement in this case?
8   A.  Yes, sir.
9   Q.  Okay.  And so, based on your recollection of that
10  conversation, is it fair to say that Mr. Miller was at least
11  led to believe that he would not face charges for his
12  continued cooperation in this case?
13  A.  Yes, sir.
14  Q.  Okay.  Do you view that as a benefit that's being
15  provided to a cooperating witness in exchange for his
16  testimony?
17  A.  Yes, sir.
18  Q.  All right.  And that was a benefit that was provided to
19  Mr. Miller; is that right?
20  A.  That's correct.
21  Q.  Now, we heard from Mr. Miller early in the case.
22  Couple months ago he testified.
23  A.  Yes, sir.
24  Q.  Do you recall sending a copy of Mr. Miller's Grand Jury
25  testimony to him after he testified?

---

Page 52

1   A.  I did not send it to him after he testified.  I sent it
2   to him just prior to his testimony in this case.
3   Q.  When did you provide Mr. Miller with a copy of his
4   Grand Jury testimony?
5   A.  Let me see.  He was going to testify last year.
6   Probably, off the top of my head, over the summer.
7   Q.  And without disclosing the location of where it was
8   mailed, was he in custody or out of custody when you sent
9   that to him?
10  A.  He was in custody.
11  Q.  All right.  So you sent a copy of his Grand Jury
12  transcripts to Mr. Miller while he was housed in prison
13  somewhere?
14  A.  Yes, sir.
15  Q.  Why?
16  A.  To let him review what he had said previously and --
17  before the Grand Jury.
18  Q.  Were you concerned at all about introducing Grand Jury
19  transcripts into a prison where Mr. West was being housed?
20  A.  Well, he -- Mr. West or Mr. Miller?
21  Q.  Mr. Miller.  Excuse me.  "Buzz" Miller.
22  A.  Was I concerned?
23  Q.  Yes.
24  A.  I ran the fact of whether I was going to supply him a
25  copy of that Grand Jury through the U.S. Attorney's Office.

---

Page 53

1   The U.S. Attorney's Office said to go ahead and send it out.
2   Being that as it may, I sent it out so...
3   Q.  Who did you consult with in the U.S. Attorney's Office?
4   A.  The lead prosecutor at the time, Mr. Jessner.
5   Q.  Do you also recall sending to Mr. Miller a copy of the
6   indictment, the 120-page indictment?
7   A.  Yes, sir, I did.
8   Q.  And when did you send him the indictment?
9   A.  I'm guessing it's going to be early 2003.
10  Q.  Now, the indictment -- you've read it, right?
11  A.  Yes, sir.
12  Q.  And would you agree with me that the indictment first
13  runs approximately 120 pages in length, right?
14  A.  Sure.  Yes, sir.
15  Q.  And it contains a lot of detail about the allegations
16  that are being -- that were filed against these defendants?
17  A.  Yes, sir.
18  Q.  Okay.  In a sense, would you agree that it's a road map
19  to the prosecution?
20  A.  It's in a summary fashion, yes, sir.
21  Q.  Okay.  Specific as to dates of a variety of offenses?
22  A.  Yes, sir.
23  Q.  Allegations about when things happened, right?
24  A.  Yes, sir.
25  Q.  And who did what to whom, those types of things?

---

14  (Pages 50 to 53)

6c531450-2b56-43d7-b893-8d2d8df71d94

## Page 54

1  A.  Yes, sir.
2  Q.  And you sent this to Mr. West while he was in -- to
3  Mr. Miller, excuse me -- while he was in prison in 2003?
4  A.  Yes, sir.
5  Q.  All right.  Why?
6  A.  He asked -- he asked the U.S. Attorney's Office and
7  myself for it.  We based our decision on the fact that the
8  document was available in public format.  He could have gone
9  on the internet to read it.  The day the indictments were
10  unsealed, it was available all over the internet.
11      So we -- Mr. Jessner did not see any harm in providing
12  him with a copy of it.  So based on that decision, we sent
13  him a copy.
14  Q.  Do you know whether Mr. Miller shared that indictment
15  with anyone else?
16  A.  I don't know.
17  Q.  Okay.  It's possible that he could have, right?
18  A.  It's very possible.
19  Q.  And he was in custody, so he wouldn't have the access
20  to that indictment unless somebody from the government sent
21  it in to him, right?
22  A.  Well, it was an open -- it was available over the
23  internet and open sources, so I don't think it could have
24  been stopped by prison officials, but I don't know.  I'm
25  guessing maybe his mother could have mailed it in.

## Page 55

1  Q.  You think his mom might have mailed it?
2  A.  I'm just giving you an example.  I don't -- I don't
3  know.  But it wasn't a super-secret document at the point in
4  time in which I sent it in.
5  Q.  Did you or anyone from the government to your knowledge
6  provide Mr. Miller with funds since he testified in this
7  case?
8  A.  I believe we provided him with funds while he was in
9  town to testify in this case to assist him with his living
10  expenses.
11  Q.  How much did you provide him with?
12  A.  I'm going to guess high, because I really don't know,
13  but I'm going to say $200.
14  Q.  $200?
15  A.  Yes, sir.
16  Q.  Would those be in the form of a money order?
17  A.  Those would be in the form of cash.
18  Q.  Okay.  Cash.  In addition to the cash that you provided
19  him, you also sent him two $100 money orders within the past
20  year; is that right?
21  A.  Yeah, it sure sounds correct.
22  Q.  Why was that?
23  A.  I believe he was moving into a house, off the top of my
24  head, and I think we were just going to help him with some
25  of the start-up costs.

## Page 56

1  Q.  Had Mr. Miller decided not to continue his cooperation,
2  I take it that his funds would have been cut off as well; is
3  that right?
4  A.  Probably, yes.
5  Q.  Okay.  Do you know a fellow named Christopher Risk?
6  A.  Yes, sir.
7  Q.  Tell us how you know Christopher Risk.
8  A.  I was -- I met Christopher Risk.  I called him on the
9  telephone, oh, jeez, in '99 or 2000, while he was
10  incarcerated, I believe, in Texas.
11  Q.  Okay.  Did you meet with Mr. Jessner and Mr. Risk
12  shortly before Mr. Risk testified before the Grand Jury in
13  May of 2004?
14  A.  Yes, I did.
15  Q.  All right.  Do you recall whether there was any
16  discussion of the government helping Mr. Risk out in his --
17  in the amount of time he had left to serve?
18  A.  I believe the discussion was that we would let anyone
19  know who he wanted us to know that he was cooperating with
20  the government.
21  Q.  And who was it that he wanted you to notify about his
22  cooperation?
23  A.  I think we were to notify his attorney.
24  Q.  All right.  Do you recall Mr. Jessner telling Mr. Risk
25  that he had done enough time and that the time remaining on

## Page 57

1  his state sentence was not an insurmountable obstacle?
2  A.  I don't remember that, no, sir.
3  Q.  All right.  But you do recall a conversation with
4  Mr. Risk that took place several days before his Grand Jury
5  testimony in May of 2004?
6  A.  Yes, sir.
7  Q.  And was that with you, Mr. Jessner, and Mr. Risk?
8  A.  Yes, sir.
9  Q.  And during the course of that conversation, was the
10  topic of what the government could do for Mr. Risk in
11  regards to his state sentence discussed?
12  A.  Is it, with the government -- like, if we could lower
13  it?  No, sir, that was not discussed.  We told Mr. Risk that
14  we would provide a letter to whoever he would like, as we
15  have told to pretty much all of our witnesses, to advise
16  whoever they like us to advise that they are cooperating
17  with the government, but that we would provide no
18  recommendation as to what that other entity should do.
19  Q.  Do you recall telling Mr. Risk, after you've had a
20  chance -- I think it was right after his Grand Jury
21  testimony that, quote, "The government is now prepared to
22  provide whatever assistance it can to help reduce" his
23  sentence in Colorado?
24  A.  No.
25  Q.  Did you ever say that to --

15 (Pages 54 to 57)

*Vol 2 Shott*

CR 02-938(E)-DOC          March 23, 2006

Page 82

1   A   Yes.  I believe so, yes.
2   Q   The memorandums that would go between Marion and ADX are
3   the memos that were generated by some SIS personnel, and those
4   would be the -- it sounds like you were saying a weekly intel
5   memo?
6   A   Yeah, the intel briefing, yes.
7   Q   And that would be, basically, what the SIS person or
8   people at Marion had for that previous seven days or what
9   their -- what they had collected and their impressions,
10  correct?
11  A   Yes.
12  Q   And then they would shoot that or send that over to you
13  guys --
14  A   Yes.
15  Q   -- is that correct?
16  A   Now, it also went to several other places.  It went to our
17  central office.  It also went to Sacramento intelligence unit,
18  which was Stan Beckwith at the time.
19  Q   What does the Sacramento intelligence unit do?
20  A   They're kind of a clearinghouse for intel, so all
21  intel would go in there, and they would determine what they
22  were going to put out to the field, meaning put out to the
23  other institute.
24  Q   It just so happened that that's in Sacramento, but it
25  means the whole BOP?

Page 83

1   A   Yes, sir.
2   Q   Okay.  And the person that was running that unit would get
3   these memos or these intelligence briefings from all the other
4   USPs that had -- that were sending these type of things in?
5   A   Well, a lot of them, because open yards, they don't have
6   that luxury of being able to monitor as well as we do.  The
7   penitentiaries that -- they may have a thousand on their yard.
8   They don't have the time to monitor extensively like we do, so
9   they would normally -- there were some institutions out there
10  generating these reports, but for the most part, they weren't.
11  But they were sharing intel to SIU, saying, "Hey, this came
12  up."
13  Q   But you're not -- you're not going to testify today about
14  what other units are doing in other places, were you?
15  A   Correct.
16  Q   You are not going to tell us that, right?  You don't know
17  what they were doing, you're giving me impressions.
18  A   Exactly.
19  Q   So the open yard units or the open yard prisons, you're
20  saying that they may not have been as -- they may not produce
21  as much paper as the ADX, but you're not saying that their SIS
22  units didn't do anything?
23  A   They are looking.  The penitentiaries that are out there
24  are looking for their institution.  They are looking out --
25  that's all their -- their focus is on their particular

Page 84

1   institution.  Ours, because we had the leadership, we were more
2   apt to put that stuff out to SIU and then route it out to
3   various institutions.
4   Q   Now, there is a difference in the type of federal
5   institutions.  There is the institution that is called a USP?
6   A   Yes.
7   Q   That would be a United States prison, correct?
8   A   Yes.
9   Q   All right.  Now, there was only how many USPs at that
10  time?
11  A   Lompoc, Lewisburg, Atlanta.  I don't know if Allenwood was
12  online yet.
13  Q   Do you know if they had --
14  A   Leavenworth.
15      THE COURT:  Let him finish, Counsel.
16      MR. REED:  I thought he was done, your Honor.
17      THE COURT:  No.
18      THE WITNESS:  Leavenworth, I think were the
19  penitentiaries.
20  BY MR. REED:
21  Q   Back then Lompoc was a USP?
22  A   Yes, sir.
23  Q   Terre Haute back then?
24  A   Yes, sir.  I forgot Terre Haute.
25  Q   Were you aware back in '96 whether or not there were

Page 85

1   alleged Aryan Brotherhood members at these other USPs?
2   A   I don't want to speculate.  I don't know.
3   Q   You don't know?  Well, let me ask you this.  If there
4   were -- well, again, Danine Adams may be the person to ask
5   this, and you can tell me whether or not that's correct, but if
6   she's your SIS person that's dealing with the white inmates,
7   she's not just dealing with white inmates at ADX, correct,
8   because intel, by definition, means gathering information; is
9   that also correct?
10  A   That's correct.
11  Q   All right.  Because she accepted information from Marion,
12  correct?
13  A   Yes.
14  Q   And assuming that there are alleged AB members at Marion,
15  she would incorporate that information into her information; is
16  that correct?
17  A   (No audible response.)
18  Q   Or put it this way, if you were doing that job that you
19  were supervising her, is that how you would have done it?
20  A   It -- it's like -- it's like the ADX SIS tech and then the
21  USP Marion SIS tech talking back and forth saying, "Hey, I
22  picked this up today," and then, just going back and forth
23  discussing intel issues, especially in regards to the inmates.
24  Q   I understand.
25  A   But there's nothing -- you know, it's not like -- outside

22 (Pages 82 to 85)

Jane C.S. Rule, CSR No. 9316 - Federal Official Court Reporter

CR 02-938(E)-DOC       April 20, 2006

Page 34

BY MS. FLYNN:

2  Q   Today?
3  A   Yes, a few minutes ago.
4  Q   And you called me up there to ask me a couple questions?
5  A   Yes, I did.
6  Q   And did you ask me about providing you with money for your
7  testimony?
8  A   Yes, I did.
9  Q   What did you ask me?
10  A   I told you I need a hundred dollars a month to live on.
11  Q   Now, have you ever gotten any money from the government --
12  A   No, nothing.
13  Q   All right.  Mr. Griffin, let me interrupt you for one
14  moment.  Let me finish my question before you answer so that
15  we're not talking over each other.
16  A   All right.
17  Q   So in exchange for your testimony, you've not gotten any
18  money from the government?
19  A   No.
20  Q   And you were now asking me that you wanted some money,
21  correct?
22  A   Right.
23  Q   What did I tell you?
24  A   You said you'd have to relay that message to ATF Agent
25  Halualani.

Page 35

1  Q   But I didn't promise that we'd give you any money?
2  A   No.
3  Q   And it's your understanding when you leave the stand here
4  today, you may never see a penny?
5  A   I know that.
6  Q   It's also your understanding you may receive some money?
7  A   Yes.
8  Q   Now, you also asked me another question about your
9  security?
10  A   Yes, I had.
11  Q   What did you ask me?
12  A   Well, the only thing I've been guaranteed is word of mouth
13  that my safety would be all right.
14  Q   Why are you concerned about your safety?
15  A   Because I'm a dead man if -- if I don't get my safety.
16  Q   Okay.
17  A   I'm through.
18  Q   You say you are a dead man if you don't get your safety?
19  A   Right.
20  Q   Do you mean because you are testifying here, your safety
21  is at issue?
22  A   Oh, I'd say definitely.
23  Q   Why do you say that?
24  A   Just the people I'm dealing with.
25  Q   Who are the people you are dealing with?

Page 36

1  A   I'm dealing with AB, Aryan Brotherhood.
2  Q   And during your time in prison, have you known AB members
3  and known of the AB as an organization?
4  A   Yes.
5  Q   Did you know them to be a dangerous organization?
6  A   They are for real.
7  Q   Is that why you fear your safety --
8  A   Sure, sure.
9  Q   -- for testifying here today?
10  A   That's right.
11  Q   And I think there was a third thing you asked me when
12  you -- you spoke to me before the jury came back, and that was
13  about a phone call?
14  A   Yes.
15  Q   What was that?
16  A   I'd like to make a phone call, because I ain't told my
17  people what I'm doing here, and now I have to.  I mean, you
18  know, for their safety.
19  Q   Now, when you say "your people" --
20  A   Right.
21  Q   -- do you mean your family?
22  A   My family.
23  Q   And you want to notify them, because you are testifying
24  here?
25  A   Sure.

Page 37

1  Q   Why did you want to tell me that you needed to make a
2  phone call?
3  A   Well, you know, it's -- it's necessary.  I mean, it's --
4  bottom line is -- is, you know, this isn't no joke, and I don't
5  want to see nobody get hurt, but they need to know.
6  Q   And as an inmate, do you typically make collect calls to
7  your family?
8  A   Every now and then.
9  Q   And you are concerned, because you don't want to make this
10  call as a collect call, correct?
11  A   Right.
12  Q   So is it fair to say you were asking me for assistance
13  in -- in having the government pay for this telephone call?
14  A   Yes, I did.
15  Q   And what did I tell you?
16  A   That you would set it up.
17  Q   That I would try to arrange that phone call for you?
18  A   Uh-huh.
19  Q   Now, other than those three areas that we covered here
20  today, have you been promised anything --
21  A   Nothing.
22  Q   -- in exchange for your testimony?
23  A   Nothing.  This is -- this -- nothing.
24  Q   Now, you stated that you are currently in prison?
25  A   Yes.

10 (Pages 34 to 37)

*Vol #3   Griffin*   *4-20-00*

Page 42

1    Q.  And did you ever see a copy of a report or anything
2    that he did after talking to you?
3    A.  No.
4    Q.  And the second time you talked with law enforcement was
5    with Agent Halualani; is that right?
6    A.  Right.
7    Q.  Would have been in 2001?
8    A.  Right.
9    Q.  Okay.  And where did that conversation take place?
10   A.  ADX.
11   Q.  And he come to see you?
12   A.  No, it was on the phone.
13   Q.  Have you ever actually met him in person?
14   A.  Not until I come in.
15   Q.  And you didn't testify in front of the grand jury in
16   this case, did you?
17   A.  No, I didn't.
18   Q.  Now, you weren't really fond of Cleo Roy, were you?
19   A.  Me and Cleo was partners.
20   Q.  Partners?
21   A.  That's right.
22   Q.  Wasn't there an incident a couple of months before
23   Tommy Lamb died where he beat you up?
24   A.  Beat me up?
25   Q.  Beat you up.

Page 43

1    A.  He's never beat me up.
2    Q.  No?
3    A.  Never put his hands on me.
4    Q.  Okay.  Didn't Cleo Roy beat you up because you tried to
5    rape a young white guy in a shower at Marion?
6    A.  Nah.  Nah.  He -- he didn't put his hands on me.
7    Q.  Okay.
8    A.  But what you're talking about is an incident that
9    happened, but Cleo Roy never put his hands on me.
10   Q.  Did somebody beat you up?
11   A.  No, nobody put their hands on me.
12   Q.  Okay.  But you did do what I just said you tried to do;
13   right?
14   A.  I smacked a dude.  And he threw them up.  He fought.  I
15   left him alone.
16   Q.  Was your intent to rape the guy?
17   A.  If I was going to rape him, I could have raped him.
18        MS. FLYNN:  Objection.  Your Honor.  Relevance.
19        THE COURT:  Pardon me?
20        MS. FLYNN:  Relevance.
21        MR. STEWARD:  I'll move on.  Withdraw it.
22   BY MR. STEWARD:
23   Q.  Mr. Griffin, you understand that when you come in here
24   and testify today, it's important that you testify
25   consistent with the government's theory of this case; right?

Page 44

1    A.  All I know is just get up here and tell the truth.
2    Q.  But you do understand that if the truth as you see it
3    isn't right where they're at, where their story is at,
4    they're not going to call you as a witness; right?
5    A.  No.
6    Q.  And if they don't call you as a witness, you have zero
7    chance of getting that hundred bucks a month; right?
8    A.  If they don't call me as a witness, I'm coming home
9    this year.  Take the hundred dollars, take whatever you want
10   to do and put it where the sun don't shine.  I don't care.
11   I'm not here for the money.  If I was here for the money,
12   I'd be asking for a lump sum of money.
13        MR. STEWARD:  Thank you, your Honor.
14        THE WITNESS:  Yes.
15        THE COURT:  Thank you.  This will be Mr. White on
16   behalf of Mr. Bingham, cross-examination of Mr. Griffin.
17            CROSS-EXAMINATION
18   BY MR. WHITE:
19   Q.  Mr. Griffin, I want to go back to the discussion about
20   these various dropouts from the Aryan Brotherhood that you
21   have come in contact with since 1998; all right?
22   A.  All right.
23   Q.  In 1998, you were in the ADX; is that correct?
24   A.  That's right.
25   Q.  And since '98 until the present, you've been in various

Page 45

1    PC-Units at the ADX?
2    A.  Right.
3    Q.  And during those occasions in the PC-Units, you have
4    come in contact with a number of dropouts from the Aryan
5    Brotherhood?
6    A.  Yes.
7    Q.  And you named some of those people.  And one of the
8    people you named was Kevin Roach; is that correct?
9    A.  That's right.
10   Q.  And you told us that it's become a circus; is that
11   right?
12   A.  That was my own personal opinion, yes.
13   Q.  Okay.  Well, that's what I'm asking for, your personal
14   opinion.
15        And when you say it's become a circus, you're
16   referring to these various AB dropouts and their involvement
17   in this case; is that correct?
18   A.  No.  I was saying this here is what I really meant.
19   They was dictating the car, who was going to get in the car,
20   who was going to get in the car and this and that there.
21   They dictated all that there with the other prosecutor.
22   Q.  Jessner?
23   A.  Yeah.
24   Q.  Gregory Jessner?
25   A.  I mean, that's what they was telling me.  I've never

*Griffin Vol #3   4-20-06*

**Page 22**

1  getting paid to come to court, but there was guys that was
2  getting a hundred dollars that I know of.  And that's all I
3  know on it.
4  Q.  Okay.  Listen to the question.
5  A.  Right.
6  Q.  Who has told you that they are getting paid in
7  connection with this case?
8  A.  Nobody told me they are getting paid in connection with
9  this case.  But Kevin Roach told me he's getting a hundred
10  dollars a month to live on.
11  Q.  And when was the last time you spoke with Mr. Roach?
12  A.  Probably '93 -- I mean 2003.
13  Q.  Okay.  You've seen him in the last couple of days?
14  A.  No.
15  Q.  Okay.  And in 2003 -- now, you've never been in the
16  WITSEC program; right?
17  A.  No.
18  Q.  As part of your request this morning, did you ask to be
19  considered for it?
20  A.  I never asked for WITSEC.  I just -- I'm a dead man
21  with what I'm doing here right now.  Now, you don't think
22  that's -- that's a fact.  But I never asked for WIT.  I just
23  want protection.  I want something to go and I ain't have to
24  look over my shoulder every day.
25  Q.  Didn't you tell us this morning that you began your

**Page 23**

1  cooperation in 1993?
2  A.  No.  I didn't begin no cooperation in 1993.  I began my
3  cooperation about 1995.  And I didn't cooperate.  I -- I --
4  I got mad -- I didn't -- it didn't feel right.  I told them,
5  "No."
6  Q.  In the federal system --
7  A.  Right.
8  Q.  -- everybody's known that you've been an informant
9  since '95; right?
10  A.  Yeah.
11  Q.  I mean, you've been in a PC-Unit since '95?
12  A.  Since '95 been in a PC-Unit, yes.
13  Q.  When you say you last spoke to Kevin Roach in 2003,
14  that was at the ADX; right?
15  A.  At the ADX in J-Unit.
16  Q.  And how long a period -- well, let me stop.
17      MR. STEWARD:  Your Honor, may I -- Exhibit 1034,
18  which has already been admitted?
19      THE COURT:  1034.
20  BY MR. STEWARD:
21  Q.  Okay.  Does that look familiar to you, Mr. Griffin,
22  1034?
23  A.  It looks like J-Unit.
24  Q.  And how long were you housed in J-Unit?
25  A.  About a year.

**Page 24**

1  Q.  And while you were there, you were able to follow -- do
2  you see my finger here?  You were able to, like, sit out
3  here in these tables, right, during the day?
4  A.  I was wide open.  Yeah.
5  Q.  And so you and whoever else is in J-Unit was able to
6  talk freely for at least the year that you were there;
7  right?
8  A.  Right.
9  Q.  Okay.  And what year was that?  2003?
10  A.  2003 or 2002, right in there.  It's -- I think '3.
11  Q.  Okay.  And during that period of time -- was that the
12  first time you ever met Kevin Roach?
13  A.  Yes, it is.
14  Q.  Were you housed with him for the full year?
15  A.  Almost.  He went back to D-Unit because he was trying
16  to get something done.  He was mad about something.  I don't
17  know.
18  Q.  So he left and went back to D-Unit?
19  A.  Right.
20  Q.  Now you, yourself, have been housed in the last, let's
21  say, six years in H-Unit; right?
22  A.  H-Unit, yes.
23  Q.  J-Unit?
24  A.  J-Unit, yes.
25  Q.  And D-Unit?

**Page 25**

1  A.  And D-Unit.
2  Q.  And most recently D-Unit; right?
3  A.  Most recently D, yep.
4  Q.  And the folks that -- these are all or have been
5  PC-Units; right?
6  A.  It's a PC-Unit, yes.
7  Q.  Right.  And I think you said this morning in answer to
8  a question for Ms. Flynn that there are a number of AB
9  dropouts in there; is that right?
10  A.  There was a few.
11  Q.  Okay.  And Mr. Roach would be one of those.
12  A.  Mr. Roach one of them.
13  Q.  Okay.  And these folks are all, at least when you were
14  in J-Unit, all housed in an open unit like this; correct?
15  A.  Right.
16  Q.  Okay.  Now, some of the other folks that you've been
17  housed with in the last couple of years either have been or
18  are scheduled to testify in this trial; right?
19  A.  I am not for sure.  I've never asked who's testifying.
20  Q.  Okay.  But you know Mr. Roach was; right?
21  A.  I know he is, sure.
22  Q.  Okay.  How about a guy by the name of Bernard?  Have
23  you ever met Richard Bernard?
24  A.  I know who you're talking about, but I don't know if
25  he's testifying.

Name: Tyler Blackman

Reg. No.: 03502-081

U.S. PENITENTIARY MAX
P.O. BOX 8500,
FLORENCE, CO 81226-8500

Denver, CO PROC DISTR CTR
FRI 20 JUN 2014   PM

RECEIVED
CLERK, U.S. DISTRICT COURT
JUN 23 2014
CENTRAL DISTRICT OF CALIFORNIA

RECEIVED
CLERK, U.S. DISTRICT COURT
SOUTHERN DIVISION
JUN 2 4 2014
CENTRAL DISTRICT OF CALIFORNIA
BY

DOC

Clerk of The Court
for Central District of California
1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012